# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAMES P. FORD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | C.A. No.: 1:14-CV-01046-RGA |
| | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

## **MEMORANDUM OPINION**

Gary Linarducci, Esq., Linarducci & Butler, New Castle, DE. Attorney for Plaintiff.

Charles M. Oberly, III, United States Attorney, and Dina White Griffin, Special Assistant United States Attorney, Office of General Counsel, Social Security Administration, Wilmington, DE. Attorneys for Defendant.

July 3l , 2015
Wilmington, Delaware

ANDREWS, UNITED STATES DISTRICT JUDGE:

Plaintiff James P. Ford appeals the decision of Defendant, Carolyn W. Colvin, the Acting

Commissioner (the "Commissioner") of the Social Security Administration, which denied

Plaintiff's application for Social Security disability benefits ("DIB") under Title II of the Social

Security Act. 42 U.S.C. §§ 401-34. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g),

which grants jurisdiction to the District Courts to review the final decision of the Commissioner.

Pending before the Court are cross-motions for summary judgment filed by Plaintiff and

the Commissioner. (D.I. 10, 13). For the reasons set forth below, the Court will grant Plaintiff's

motion for summary judgment, will deny Defendant's motion for summary judgment, and will

remand the matter for further proceedings.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff filed his application for DIB on April 1, 2009. (D.I. 7 (hereinafter "Tr.") at p.

111). His application was denied, both initially and on reconsideration. (*Id.* at pp. 111-12).

Plaintiff then requested a hearing, which occurred on September 22, 2010. (*Id.* at pp. 69-110).

The Administrative Law Judge ("ALJ") denied Plaintiff's claim. (*Id.* at pp. 119-37). Plaintiff

requested review of the ALJ's decision by the Appeals Council, which resulted in the remand of

Plaintiff's case back to the ALJ. (*Id.* at pp. 113-18).

The ALJ held the second hearing on February 5, 2013. (*Id.* at pp. 36-62). The ALJ's

decision was partially favorable. (*Id.* at p. 19). The ALJ determined that Plaintiff was disabled

from January 9, 2008 to July 17, 2009. (*Id.* at pp. 14-30). The ALJ found him no longer

disabled as of July 18, 2009. (*Id.*). Plaintiff requested that the Appeals Council review the

ALJ's decision, but his request was denied. (*Id.* at pp. 1-6). Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (D.I. 11 at p. 1).

## B. Plaintiff's Medical History

At the time of the ALJ's decision, Plaintiff was fifty years old. (Tr. at p. 19). He has a high school education. (*Id.*). His past relevant work includes construction worker, automobile detailer, line inspector, and utility locator. (*Id.*). At the time of the second hearing, Plaintiff was 6'02" tall and weighed approximately 289 pounds, meeting the National Health Institute's criteria for obesity. (*Id.* at p. 24).

The record contains Plaintiff's detailed medical history. The Court will provide a summary of the evidence. On October 31, 2007, Plaintiff was on his way to a service call for work when he was in a motor vehicle accident. (*Id.* at pp. 81-82). Plaintiff did not go to the hospital when the accident occurred because his boss asked him not to go. (*Id.* at p. 82). On January 7, 2008, Plaintiff went to see Ronald Goodman, D.O. at Total Care Physicians, P.A. for back pain. (*Id.* at p. 401). Dr. Goodman referred Plaintiff to Kennedy Yalamanchili, M.D. of Delaware Neurosurgical Group, P.A. (*Id.* at p. 393). On January 21, 2008, Dr. Yalamanchili examined Plaintiff and diagnosed him with herniated lumbar disk, lumbar spondylosis without myelopathy, lumbar disk degeneration, and lumbar radiculopathy. (*Id.*). Dr. Yalamanchili believed Plaintiff to be unable to work at that time and offered him a trial of conservative treatment. (*Id.*).

On July 17, 2008, Plaintiff underwent lumbar spinal fusion surgery at the L4-L5 level. (*Id.* at pp. 390, 397). At the postoperative follow-up in August 2008, Dr. Yalamanchili noted that Plaintiff was still experiencing pain, although his x-rays showed good alignment and good

2

placement of instrumentation.[1] (*Id.* at p. 390). Dr. Yalamanchili also noted that Plaintiff's recovery seemed typical. (*Id.*). Plaintiff still felt pain at his three-month postoperative visit on October 1, 2008. (*Id.* at p. 389). Plaintiff returned to Dr. Yalamanchili on January 14, 2009 for another visit. Because he still complained of pain, Plaintiff underwent a CT scan. (*Id.* at p. 388). The CT showed good arthrodesis at the L5-S1 level and sound placement of the instrumentation. (*Id.*). Dr. Yalamanchili suggested a dorsal stimulator. (*Id.*). When Plaintiff felt little improvement regarding his symptoms at his May 2009 appointment, Dr. Yalamanchili suggested either a dorsal stimulator or hardware removal surgery. (*Id.* at p. 421). Dr. Yalamanchili also referred Plaintiff to a pain center for pain management. (*Id.*).

In August 2009, Plaintiff saw Vinod K. Kataria, M.D., a State agency medical consultant who performed a Physical Residual Functional Capacity ("RFC") assessment. (*Id.* at pp. 433-39). Dr. Kataria determined that Plaintiff could frequently lift or carry ten pounds but could only occasionally lift twenty pounds. (*Id.* at p. 434). Plaintiff could stand/walk for two hours and sit for six in an eight hour work day. (*Id.*). Dr. Kataria noted that Plaintiff was limited in pushing and pulling with his lower extremities and that he could occasionally climb ramps and stairs, stoop, balance, kneel, crouch and crawl. (*Id.* at pp. 434, 436). Another State agency medical consultant, Anne Aldridge, M.D., affirmed Dr. Kataria's assessment of Plaintiff. (*Id.* at p. 447).

Dr. Goodman prescribed Plaintiff Cymbalta for depression in September 2009. (*Id.* at p. 446). In November 2009, Plaintiff underwent a psychological evaluation by Brian Simon, Psy.D. (*Id.* at pp. 448-52). Dr. Simon determined that Plaintiff had adjustment disorder with mixed anxiety and depressed mood and that his condition was chronic. (*Id.*at p. 452). Dr. Simon opined that Plaintiff's impairments were either mild or moderate and did not find any of his

---

[1] By "instrumentation," I mean the devices inserted into Plaintiff as a part of the spinal fusion surgery.

3

impairments to be severe. (*Id.* at pp. 454-55). Plaintiff was also evaluated by Pedro Ferreira, Ph.D., a State agency medical consultant who performed a Psychiatric Review Technique. (*Id.*at pp. 456-66). Regarding Plaintiff's daily living activities and social functioning, Dr. Ferreira found his restrictions to be mild. (*Id.* at p. 464). Plaintiff had moderate difficulty in maintaining concentration, persistence, and pace. (*Id.*). Dr. Ferreira also completed a Mental RFC Assessment. (*Id.* at pp. 467-69). He determined Plaintiff had the RFC to "engage in simple, routine occupational demands." (*Id.* at p. 469).

On June 18, 2010, Plaintiff saw Dr. Yalamanchili regarding his continued back pain. (*Id.* at p. 492). At the appointment, Plaintiff told Dr. Yalamanchili that he was currently taking the various pain medications that Dr. Goodman had prescribed him. (*Id.*). Plaintiff underwent a CT scan, which came back as a normal postoperative study post L5-S1 fusion. (*Id.* at p. 496). The CT scan did not show any sign of disk herniation or spinal stenosis. (*Id.*). Dr. Yalamanchili prescribed Plaintiff a TENS unit and recommended that any narcotics be prescribed at a low level. (*Id.* at p. 493). Dr. Yalamanchili discussed with Plaintiff the possibility of future surgery to remove the hardware. (*Id.* at p. 492). On June 29, 2010, Plaintiff had an EMG study done of his right lower leg, which was consistent with L5 radiculopathy. (*Id.* at p. 494).

In September 2010, Plaintiff saw Dr. Goodman, who noted that Plaintiff was waiting for clearance from his insurance company for surgery. (*Id.* at p. 538). Dr. Goodman also noted that Plaintiff was experiencing back spasms as well as depression and anxiety because of his back condition. (*Id.* at p. 539). From October 2010 through June 2011, Plaintiff visited Dr. Goodman complaining of back spasms, depression, and anxiety. (*Id.* at pp. 541-73). In July 2011, Plaintiff saw Dr. Yalamanchili again. (*Id.* at p. 516). He noted that Plaintiff had failed back syndrome and believed that Plaintiff continued to be disabled. (*Id.*). Dr. Yalamanchili referred Plaintiff to

4

Dr. Greenberg and recommended that he undergo a psychological consult before proceeding with any surgical intervention. (*Id.* at p. 517). From July 22, 2011 through December 6, 2011, Dr. Goodman noted no real change in Plaintiff's symptoms. (*Id.* at pp. 582-99) On December 30, 2011, Dr. Goodman noted that Plaintiff was experiencing more pain. (*Id.* at p. 600).

On February 7, 2012, Plaintiff saw Dr. Greenberg. (*Id.* at p. 518). Dr. Greenberg believed that Plaintiff was a poor surgical candidate at that time because of his emotional state and psychological stresses. (*Id.* at p. 519). Dr. Greenberg noted that surgery could be an option in the future if Plaintiff's mental state improved. (*Id.*). Plaintiff saw Dr. Greenberg again on June 11, 2012, where he noted that Plaintiff remained depressed and was disabled from working. (*Id.* at p. 521). Dr. Greenberg noted that Plaintiff was sleep deprived. (*Id.*)

Dr. Goodman referred Plaintiff to a pain management doctor, Emmanuel Devotta, M.D., in October 2012. (*Id.* at p. 533). Dr. Devotta noted that Plaintiff's pain level ranged from six to eight out of ten. (*Id.*). Because Plaintiff felt that his pain was increasing in intensity, Dr. Devotta prescribed him the narcotic Avinza to take along with oxycodone. (*Id.* at p. 534). Dr. Devotta told Plaintiff to continue taking gabapentin and he switched Plaintiff's muscle relaxant from Soma to Skelaxin. (*Id.*). Plaintiff continued to see Dr. Devotta through December 2012. (*Id.* at p. 526). Although Dr. Devotta recommended a caudal epidural injection, Plaintiff had trouble getting his insurance company to approve it. (*Id.* at p. 529). On December 19, 2012, Dr. Devotta noted that Plaintiff's pain level was at a five or six and that he was able to cope with his daily activities. (*Id.* at p. 526).

Throughout this time, Plaintiff continued to see Dr. Goodman, his primary care physician. He denied feeling any sensory decrease from January 2012 through September 2012. (*Id.* at pp. 604-37).

5

## C. The ALJ's Decision

On March 15, 2013, the ALJ issued a partially favorable decision. (Tr. at p. 14). In the decision, the ALJ incorporated her prior discussion of the prior documentary and testimonial evidence, issues, law and regulations, and evaluation of medical opinions as set forth in her 2010 decision. (*Id.* at p. 18; *see also* Exhibit 4A). After reviewing the evidence, the ALJ determined that Plaintiff was disabled from January 9, 2008 through July 17, 2009. (Tr. at p. 19). The ALJ found during that period that Plaintiff experienced the following severe impairments: depression, lumbar degenerative disk disease, and obesity. (*Id.* at p. 22). The ALJ determined that Plaintiff's lumbar degenerative disk disease was severe enough to meet the criteria of § 1.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

The ALJ found that as of July 18, 2009, Plaintiff had experienced medical improvement, and determined that Plaintiff no longer met a listing and therefore could perform substantial gainful activity.[2] (*Id.* at p. 19). In finding Plaintiff no longer disabled, the ALJ determined that Plaintiff had the RFC to perform a limited range of light work. (*Id.* at p. 26). The ALJ limited him to performing simple, unskilled work. (*Id.*). Plaintiff could walk/stand for two hours in an eight hour day and sit for six hours in an eight hour day with sit/stand option. (*Id.*). The ALJ held him to be limited in pushing/pulling with his lower extremities. (*Id.*). The ALJ also held that Plaintiff had to avoid climbing ladders, ropes, and scaffolds. (*Id.*). Finally, the ALJ held that Plaintiff had to avoid concentrated exposure to vibration and moderate exposure to moving machinery, heights, and production pace work. (*Id.*).

---

[2] The ALJ discredited Dr. Greenberg's opinion that Plaintiff was disabled because Dr. Lorber, an orthopedic specialist present at the hearing, testified that Plaintiff "lacked positive clinical and/or objective findings post July 18, 2009 that showed focal or neurologic deficit." (Tr. at p. 28).

6

Based on Plaintiff's RFC, the ALJ determined that Plaintiff could no longer perform his past work. (*Id.* at p. 28). In determining whether Plaintiff could perform other work, the ALJ consulted with a vocational expert. (*Id.* at p. 29). The ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (*Id.*). Therefore, the ALJ determined Plaintiff was not disabled as of July 18, 2009. (*Id.* at p. 30).

## II. LEGAL STANDARD

### A. Standard of Review

Under the Act, the Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2011). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citations omitted).

The Third Circuit has explained that a:

7

> single piece of evidence will not satisfy the substantiality test if
> the [Commissioner] ignores, or fails to resolve, a conflict created
> by countervailing evidence. Nor is evidence substantial if it is
> overwhelmed by other evidence – particularly certain types of
> evidence (e.g., evidence offered by treating physicians) – or if it
> really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Even if the reviewing Court would have

decided the case differently, it must give deference to the ALJ and affirm the Commissioner's

decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## B. Disability Determination Process

Title II of the Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance

benefits to persons who have contributed to the program and who suffer from a physical or

mental disability." *Brown v. Yuckert*, 482 U.S. 137, 140 (1987). To qualify for DIB, the

claimant must establish that he or she was disabled prior to the date he or she was last insured.

*See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is

defined as the inability to do any substantial gainful activity by reason of any medically

determinable physical or mental impairment, which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months. *See*

42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if her physical or mental impairment or

impairments are of such severity that she is not only unable to do her previous work but cannot,

considering her age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v.

Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28

(3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the

8

sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. If the claimant is so engaged, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. If the claimant is not suffering from a severe impairment or a severe combination of impairments, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

At step three, if the claimant's impairments are severe, the Commissioner compares the claimant's impairments to a list of impairments (the "Listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. If a claimant's impairment or its medical equivalent matches a Listing, then the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments or combination of impairments do not appear as, or are not medically equivalent to, a Listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. §404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is work "which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (citations omitted). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is able to return to her past relevant work, the claimant is not disabled. *See id.*

9

If the claimant is unable to return to past relevant work, step five requires the

Commissioner to determine whether the impairments preclude the claimant from adjusting to any

other available work. *See* 20 C.F.R. § 404. 1520(g); *Plummer*, 186 F.3d at 428. At this last step,

the burden shifts to the Commissioner to show that the claimant is capable of performing other

available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other

words, the Commissioner must prove that "there are other jobs existing in significant numbers in

the national economy which the claimant can perform, consistent with her medical impairments,

age, education, past work experience" and her RFC. *Id.* In making this determination, the ALJ

must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the

ALJ often seeks the assistance of a vocational expert.

## III. DISCUSSION

Plaintiff raises multiple objections to the ALJ's decision. First, the ALJ erred in not

applying a "freeze" to his disability insurance benefits. Second, Plaintiff's RFC of limited light

work should be considered sedentary, rather than light, work. Third, the ALJ erred by

incorporating her prior opinion and by not adequately complying with the Appeals Council's

remand order. Fourth, the ALJ did not correctly evaluate the medical opinions. Fifth, the ALJ

improperly found medical improvement as of July 18, 2009. Sixth, the ALJ failed to include

mental limitations in her RFC finding.

### A. Disability Freeze

Plaintiff argues that the ALJ erred by failing to apply a "disability freeze" after finding

him disabled from January 9, 2008 to July 17, 2009, a period of eighteen months. (D.I. 11 at p.

2). Because of that period of disability, Plaintiff asserts his insured status should have been

extended through June 2013. (*Id.* at pp. 2-3.). During this period of extended coverage, Plaintiff

10

would have advanced to the next age category, "closely approaching advanced age." (*Id.* at pp. 3-4). He argues that the ALJ's failure to apply a freeze is not a harmless error and is outcome-determinative. (*Id.*).

The purpose of a disability freeze is "[t]o eliminate the years of low earnings (due to a worker's disability) from the computation of benefits and to preserve the worker's insured status." Program Operations Manual System ("POMS") DI 10105.005.[3] "Insured status is frozen to protect future rights and benefits." *Id.* *See also Beckham v. Colvin*, 2015 WL 733785, at *13 n.8 (D. S.C. Feb. 20, 2015) ("The ALJ noted Plaintiff sought a disability freeze in an attempt to extend his date last insured."); *Lanier v. Colvin*, 2014 WL 62281, at *4 (E.D. Wash. Jan. 8, 2014) ("A 'freeze' preserves insured status during a period of disability."). In calculating the disability freeze's effect, one "[does] not count as an elapsed year any year, part or all of which, is in a freeze period." POMS RS 00301.132.

Plaintiff met the insured status requirement of the Act through December 31, 2011, which is the date the ALJ used as Plaintiff's deadline for establishing disability. (Tr. at pp. 19, 22). As of December 31, 2011, Plaintiff was forty-nine years old and was considered a "younger individual (age 18-49)." (*Id.* at p. 28). In determining whether Plaintiff could work following his period of disability and if a significant amount of jobs existed for someone with Plaintiff's

---

[3] POMS are "the publicly available operating instructions for processing Social Security claims . . . ." *Artz v. Barnhart*, 330 F.3d 170, 176 (3d Cir. 2003) (quoting *Washington Dept. of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003)) (internal quotation marks omitted). "While these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect." *Id.* at 176 (quoting *Washington Dept. of Soc. & Health Servs.*, 537 U.S. at 385) (internal quotation marks omitted). "These regulations do not have the force of law." *Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 71 n. 2 (3d Cir. 1996) (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)).

Plaintiff cites SSR 13-2p as authority that POMS are binding on SSA adjudicators. (D.I. 15 at p. 4). Although SSR 13-2p does state that adjudicators must follow agency policy, including POMS, the rule pertains to evaluating drug addiction and alcoholism cases, which are issues not present here. *See* SSR 13-2p, 2013 WL 621536 (Feb. 20, 2013).

11

RFC limitations, the ALJ used this age category. (*Id.* at pp. 28-29). If the ALJ had applied a disability freeze, Plaintiff would have had until June 2013 to establish disability and would have been analyzed as a person "closely approaching advanced age" instead. (D.I. 11 at pp. 3-4). Plaintiff asserts that use of the higher age category "would require a finding that [he] was disabled as of age 50." (*Id.* at p. 4).

Defendant asserts that the ALJ's failure to apply a disability freeze is harmless. (D.I. 14 at p. 20 n. 6). Because the ALJ found Plaintiff to be capable of light work, the Medical-Vocational Guidelines[4] (the "Guidelines") direct a finding of "not disabled," even when taking into account the change in age category. (*Id.*). Defendant is correct. Here, regardless of whether Plaintiff is categorized as a "younger individual (45-49)" or as "closely approaching advanced age (50-54)," the Guidelines direct a finding of "not disabled" if a claimant has the RFC of light work. *See* 20 C.F.R. § 404, Subpart P, app. 2, Rules 202.14, 202.21. Therefore, when using an RFC of light work, the ALJ's failure to apply a disability freeze is harmless and is not outcome determinative.

While the difference in age categories is not outcome determinative if a claimant has the RFC of light work, it becomes so if one has the RFC of sedentary work. Rule 201.14, accounting for a person "closely approaching advanced age" capable of sedentary work with Plaintiff's skills, directs a finding of disabled. *See id.* § 404, Subpart P, app. 2, Rule 201.14. Rule 201.21, accounting for a "younger individual" capable of sedentary work with Plaintiff's skills, directs a finding of not disabled. *See id.* § 404, Subpart P, app. 2, Rule 201.21. Therefore,

---

[4] The Medical-Vocational Guidelines provide tables which direct a finding of "disabled" or "not disabled" using a person's RFC, age, educational level, and previous work experience. *See* 20 C.F.R. § 404, Subpart P, app. 2.

the difference in age categories is outcome determinative if a claimant has the RFC of sedentary work.

Defendant notes that because the ALJ found Plaintiff to be capable of a RFC of light work, the guidelines for sedentary work do not apply. (D.I. 14 at pp. 18-19). Although Defendant is correct in that respect, Plaintiff contends that the limitations on his RFC equate to sedentary work rather than light work. (D.I. 11 at pp. 3-4). This argument has merit and will be discussed in the following section. Therefore, the ALJ's failure to apply a disability freeze is potentially outcome determinative. The ALJ understandably, in view of her other conclusions, did not address the "disability freeze." However, because the ALJ's determination that Plaintiff can perform light work is unsupported, the ALJ on remand should take the effect of a "disability freeze" into account.

**B. The Appropriateness of Plaintiff's RFC**

Plaintiff argues that the ALJ incorrectly found him to be capable of light work. (*Id.* at p. 4). Plaintiff asserts that the limitations the ALJ placed on his ability to perform light work actually resemble sedentary work. (*Id.* at pp. 4-5) As a result, the ALJ then erred by failing to find him disabled following Rule 201.14. (*Id.* at p. 5).

An "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). Under agency policy, light work requires the ability to occasionally lift twenty pounds and frequently lift ten pounds. *See* POMS DI 25001.001. It also requires the ability to walk or stand for approximately six hours a day. *See id.* In addition, jobs are considered light when "[they] require[] walking or standing to a

13

significant degree, sitting most of the time while pushing or pulling arm or leg controls, or working at a production rate pace while constantly pushing or pulling materials even though the weight of the materials is negligible." *Id.* Sedentary work requires the ability to occasionally lift ten pounds. *See id.* "Periods of standing or walking [in sedentary jobs] should generally total no more than about two hours and sitting should generally total approximately six hours of an eight-hour workday." *Id.*

Agency policy provides guidance for applying the Guidelines when a claimant's RFC falls between two exertional levels. *See* SSR 83-12, 1983 WL 31253, at *1 (Jan. 1, 1983). If a claimant's RFC falls between two levels for which the Guidelines direct the same finding, the ALJ should apply the finding as directed. *See id.* at *2. If a claimant's RFC falls between two levels for which the Guidelines direct opposite findings, the ALJ must consider whether the claimant is slightly or significantly reduced in his or her ability to perform at the higher exertional level. *See id.* at *3. *See also* POMS DI 25025.015. If the claimant's ability is slightly reduced, the ALJ should apply the higher exertional level and find the claimant not disabled. *See* POMS DI 25025.015. If the claimant's ability is significantly reduced, the ALJ should apply the lower exertional level and find the claimant disabled. *See id.* In situations where the claimant's ability is "somewhere 'in the middle,'" Agency policy advises using a vocational expert. *See* SSR 83-12, 1983 WL 31253, at *3. Agency policy also advises the use of a vocational expert if a claimant cannot be found disabled on strength limitations alone and has additional non-exertional limitations that would affect work performance. *See* SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983).

Here, Plaintiff's RFC places him between the exertional levels of sedentary and light because he does not meet the walking/standing requirement for light work. *See* POMS DI

14

25025.015 (noting "that an RFC for standing/walking/sitting less than the top level of standing/walking/sitting requirements represents an RFC falling between exertional levels of work."). As previously noted, light work requires the ability to walk/stand for six hours a day, but the ALJ limited Plaintiff to two hours of walking/standing. (Tr. at p. 26). Defendant argues that Plaintiff's ability to perform a limited range of light work places him outside of the Guidelines' tables, and that the ALJ correctly followed SSR 83-14 by consulting a vocational expert to determine whether jobs existed in the national economy for a person with Plaintiff's limitations. (*Id.*). Defendant asserts that because the vocational expert identified light jobs Plaintiff could perform despite his limitations, Plaintiff's RFC does not equate to sedentary work. (*Id.* at pp. 19-20).

Although Plaintiff agrees that the ALJ correctly followed SSR 83-14 by consulting a vocational expert, he asserts that the vocational expert's testimony cannot be relied upon because the testimony "is inconsistent with the Agency's definition of the exertional requirements of work." (D.I. 15 at p. 5 (citing SSR 00-4p)). Plaintiff argues that his ability to walk/stand for only two hours a day does not place him between exertional levels but rather places him at sedentary. (*Id.* at pp. 6-7). To support his case, he relies on two cases which discuss the definitions of sedentary and light work. (*Id.* at pp. 5-6). In *Anderson v. Astrue*, the court found it appropriate for the ALJ to consult with a vocational expert because the plaintiff could walk/stand for one-third to one-half of the day, which placed her between sedentary and light work. 825 F.Supp.2d 487, 497 (D. Del. 2011).

Both the *Anderson* court and Plaintiff distinguish *Anderson* from *Campbell v. Astrue*, in which the magistrate judge recommended remand because the characterization of plaintiff's RFC as light work was problematic. 2010 WL 4689521, at *5 (E.D. Pa. Nov. 2, 2010). In *Campbell*,

the ALJ determined that the plaintiff was capable of performing light work but was limited to one to two hours of walking/standing per day. *See id.* at \*3. The *Campbell* court found this limitation to contradict the definition of light work because of the amount of walking/standing light work requires, and because of light work's requirement to be able to frequently lift a specified amount. *See id.* at \* 5. Agency policy defines frequently as one-third to two-thirds of the time. *See* POMS DI 25001.001. Therefore, the *Campbell* court reasoned that the plaintiff could not comply with the lifting requirements because it would require the ability to walk/stand for up to one-third of the day and he could only do so for one-fourth. *See Campbell*, 2010 WL 4689521, at \*5.

*Campbell* is similar to the present case. Here, the ALJ limited Plaintiff to walking/standing for only two hours per day. This limitation would conflict with Plaintiff's capability of being able to frequently lift at a light level. In addition, Agency policy provides guidance for when limitations are outcome determinative, such as it would be the case here if a disability freeze were imposed. Determining which exertional level to apply depends on whether a limitation either slightly or significantly reduces a claimant's ability to perform at the higher exertional level. *See* SSR 83-12, 1983 WL 31253, at \*1; POMS DI 25025.015. Here, the ALJ stated that Plaintiff's "ability to perform all or substantially all of the requirements of [the light] level of work [have] been impeded by additional limitations." (Tr. at p. 29). These limitations could be found to be significant, necessitating the use of SSR 83-12 and POMS DI 25025.015.

Therefore, much like in *Campbell*, Plaintiff's RFC limitations seem to contradict the definition of light work. The ALJ offered no explanation as to why Plaintiff cannot do either of the two things at the heart of light work and still be classified as being capable of performing it. Further, Defendant does not provide any authority to support her assertion that a limitation of

16

two hours of walking/standing per day equates to light work and that it does not constitute a significant reduction. Because there is not substantial evidence to conclude that Plaintiff's limitations equate to light work rather than sedentary, the case must be remanded for further proceedings.

## C. Incorporation of Prior Decision and Compliance with Remand Order

Plaintiff argues that the ALJ erred by incorporating her analysis from her prior decision. (D.I. 11 at p. 6). When the Appeals Council remands a case, it vacates the decision and requires the ALJ to issue a new one. *See* Hearings, Appeals, and Litigation Law Manual ("HALLEX") I-3-7-1. Plaintiff asserts that because the Appeals Council vacated her first decision, the ALJ erred by incorporating it into her second decision. (D.I. 11 at p. 6). Plaintiff, however, does not provide support for his position that ALJs cannot incorporate prior decisions.

Rather, as noted by Defendant in her brief (D.I. 14 at pp. 12-14), the opposite seems to be true. Previous courts have permitted ALJs to incorporate their prior decisions. *See Hagins v. Colvin*, 2014 WL 5493881, at *4 (C.D. Cal. Oct. 30, 2014) (noting "in fact courts have found that an ALJ may properly incorporate an earlier decision into a later one"); *Walter v. Astrue*, 2013 WL 2422779, at *19 (N.D. W. Va. June 3, 2013) ("ALJ's can certainly incorporate findings in prior decisions in making a more current determination."); *Chavez v. Astrue*, 699 F. Supp. 2d 1125, 1136 n. 9 (C.D. Cal. 2009) (finding ALJ's incorporation of previous decision to be "permissible"). Therefore, the ALJ did not err when she incorporated her 2010 decision into her 2013 decision.

Plaintiff also contends that the ALJ erred by failing to follow the Appeals Council's remand order. (D.I. 11 at p. 7). On remand, ALJs "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals

17

Council's remand order." 20 C.F.R. § 404.977(b). Plaintiff asserts that the ALJ did not adequately follow the remand order because she failed to properly discuss the medical opinions as well as Plaintiff's use of a cane, obesity, and pain. (D.I. 11 at p. 7). Defendant argues that the Court does not have the "authority to review intermediate agency actions that occur before the issuance of the agency's 'final decision.'" (D.I. 14 at p. 12). Furthermore, Defendant asserts that Plaintiff presented this argument to the Appeals Council, which did not see it as a reason to change the ALJ's decision. (*Id.*).

Under 42 U.S.C. § 405(g), District Courts have the authority to review the final decisions of the Commissioner of Social Security. This authority does not extend to "internal, agency-level proceedings." *Bass v. Astrue*, 2008 WL 3413299, at *4 (M.D. N.C. Mar. 5, 2008) (noting that the Court "will not address whether the ALJ complied with specific provisions of the Appeals Council's remand order."). *See also Stoddard v. Astrue*, 2009 WL 2030349, at *6 (C.D. Cal. July 8, 2009) (noting that "[t]he issues before the Court are whether the ALJ's final decision is supported by substantial evidence and is free of legal error, not whether the ALJ complied with the Appeals Council's remand order" (internal citations omitted)); *Scott v. Astrue*, 2007 WL 1725252, at *8 (E.D. Pa. June 12, 2007) (determining that the Court could not review whether the ALJ complied with Appeals Council's remand order because "[u]nder 42 U.S.C. § 405(g), this Court's jurisdiction extends only to the Commissioner of Social Security's final decision, which in this case is the ALJ's second decision, not the Appeals Council's remand" (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). Therefore, Defendant is correct and this Court cannot review whether the ALJ adequately followed the Appeals Council's remand order. Even if an ALJ must follow the Appeals Council's remand order, a District Court does not have the authority to review the order and evaluate an ALJ's compliance.

18

## D. Evaluation of Medical Opinions

Plaintiff argues that the ALJ failed to properly evaluate the medical opinions pursuant to Agency policy. (D.I. 11 at p. 8). Specifically, Plaintiff asserts that the ALJ failed to properly evaluate the "treating, nontreating and nonexamining source opinions, as ordered by the Appeals Council" from the 2010 decision. (*Id.* at p. 9). Plaintiff also questions the ALJ's reasoning behind affording little weight to Dr. Greenberg, a treating psychologist, because his opinions were inconsistent with those of Dr. Lorber, the orthopedic specialist. (*Id.* at pp. 9-10). Plaintiff also discusses the ALJ's failure to evaluate the opinion of Dr. Devotta, the pain management specialist who saw Plaintiff and treated him. (*Id.* at p. 11).

To be considered a medical opinion, the statement must be from an acceptable medical source and "reflect [a] judgment[] about the nature and severity of [a person's] impairments." 20 C.F.R. § 404.1527(a)(2). This judgment includes a person's "symptoms, diagnosis, and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." *Id.* Under Agency policy, medical opinions are treated differently based on their source. *See id.* § 404.1527. In determining the weight given to a source, several factors are considered, such as the length, frequency, nature, and extent of the treating relationship, the opinion's supportability and consistency, and the specialization of the source. *See id.* § 404.1527(c)(2)-(c)(6).

Opinions from examining sources typically receive more weight than those who have not examined the claimant. *See id.* § 404.1527(c)(1). Opinions from treating sources also typically receive more weight. *See id.* § 404.1527(c)(2). A treating source opinion receives controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* If a treating source is not given controlling weight, ALJs must give "good reasons" as to why not.

19

*Id.* The determination of a person's disability, however, is reserved for the Commissioner. *See* §
404.1527(d)(1).

First, this Court will not consider Plaintiff's contention that the ALJ failed to properly
evaluate the previous medical opinions according to the Appeals Council's order. As previously
discussed, this Court does not review whether an ALJ complied with an order from the Appeals
Council.

Second, Plaintiff questions the weight given to the opinion of Dr. Greenberg, an
examining psychologist, in comparison to the weight given to the opinion of Dr. Lorber, a doctor
of another specialty, who never examined Plaintiff. (D.I. 11 at pp. 9-10). In the decision, the
ALJ afforded great weight to Dr. Lorber because she found his opinion to be consistent with the
record. (Tr. at p. 28). She gave Dr. Greenberg's opinion little weight because of its
inconsistency with Dr. Lorber's.[5] (*Id.*). Plaintiff argues that the ALJ failed to give "good
reasons" as to why she rejected Dr. Greenberg's opinion and failed to give it the expected weight
of an examining source. (D.I. 11 at p. 10). ALJs need only give good reasons when failing to
use a treating source opinion as controlling. *See* 20 C.F.R. § 404.1527(c)(2). Because Dr.
Greenberg's opinion is not a treating source opinion, the ALJ did not have to give any reasons
for giving it little weight. The ALJ was thus able to give Dr. Greenberg's opinion the weight she
believed it deserved. Dr. Greenberg's opinions were conclusory and did not discuss Plaintiff's
functional abilities aside from his mental state preventing him from being a good surgical
candidate. (Tr. at pp. 518-21). As for Dr. Greenberg's assessment that Plaintiff was disabled
from working (*id.* at p. 519), this determination can only be made by the Commissioner. *See* 20

---

[5] During the hearing, Dr. Lorber testified that Plaintiff "lacked positive clinical and/or objective
findings post July 18, 2009 that showed focal or neurologic deficit," and that Plaintiff no longer
met a listing as of July 18, 2009. (Tr. at pp. 26, 28). Therefore, the ALJ found Dr. Greenberg's
opinion that Plaintiff was disabled to be less persuasive.

20

C.F.R. § 404.1527(d)(2). Therefore, no weight had to be given to Dr. Greenberg's assessment of disability. *See id.* § 404.1527(d)(3).

Third, regarding the ALJ's failure to evaluate Dr. Devotta's opinion, Defendant correctly asserts that Dr. Devotta's opinion does not count as a medical opinion. (D.I. 14 at p.16). Although Dr. Devotta examined Plaintiff, his examination notes do not include a judgment of Plaintiff's functional abilities or of any restrictions that would affect his ability to work. (Tr. at pp. 526-37). Under 20 C.F.R. § 404.1527(a)(2), medical opinions need to include more than judgments about the claimant's symptoms and diagnosis. They must also include judgments about what a claimant can do despite his impairments and any physical or mental restrictions a claimant may have. *See* 20 C.F.R. § 404.1527(a)(2). Because Dr. Devotta's examination notes do not judge Plaintiff's abilities or any possible restrictions, his examination notes do not qualify as medical opinions. Therefore, the ALJ did not err in failing to evaluate Dr. Devotta as a treating source.

For the reasons stated, the ALJ did not err in her evaluation of the medical source opinions.

## E.    Finding of Medical Improvement as of July 18, 2009

Plaintiff asserts that the ALJ improperly found medical improvement as of July 18, 2009 because the date does not correspond with any documented change in his symptoms, signs, or laboratory findings. (D.I. 11 at p. 11). Plaintiff contends that the ALJ simply took the date from Dr. Lorber's testimony and the cited date cannot be found in any concrete finding. (*Id.* at pp. 12-13). In addition, he argues that Dr. Lorber's testimony does not establish Plaintiff experienced medical improvement related to his ability to work. (*Id.* at p. 12).

21

If the ALJ determines the claimant to be disabled at any time, the ALJ also must determine how long the claimant's disability has continued. *See* 20 C.F.R. § 404.1594(a). In doing so, the ALJ must decide whether the claimant has experienced medical improvement and if the improvement is related to the claimant's ability to work. *See id.* Agency policy defines medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." *See id.* § 404.1594(b)(1). Medical improvement through a decrease in the medical severity of any impairment (s) "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) . . . ." *Id.*

Although Plaintiff questions the basis for July 18, 2009 as the date of medical improvement, the record shows that Plaintiff experienced improvement in his symptoms. In determining Plaintiff to be disabled from January 9, 2008 through July 17, 2009, the ALJ found Plaintiff's impairments to equal Listing 1.04. (Tr. at p. 22). In his testimony, Dr. Lorber stated that he believed that Plaintiff met Listing 1.04 for at least a year following his surgery in July 2008. (*Id.* at p. 45). Dr. Lorber based his belief that Plaintiff no longer met a listing after July 2009 on findings from the record. (*Id.* at pp. 46-48).

To meet a listing, one's impairments must satisfy all criteria under the listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The record shows that Plaintiff no longer met all of the criteria needed to meet Listing 1.04. Dr. Yalamanchili stated in his deposition that CT scans showed that the fusion was successful and Plaintiff had healed properly. (Tr. at p. 313). Plaintiff's CT scan on June 18, 2010 returned a normal postoperative study. (*Id.* at p. 496). The CT scan also showed no evidence of disk herniation or spinal stenosis. (*Id.*). When seeing his primary physician, Plaintiff denied feeling any sensory decrease. (*Id.* at pp. 526, 604-27). In

22

addition, although Plaintiff may have had a positive straight leg-raising test, Dr. Lorber noted that it was not performed under the conditions required by Listing 1.04 and thus could not be relied upon. (*Id.* at pp. 47, 528).

As for Plaintiff's contention that Dr. Lorber's testimony did not establish medical improvement related to Plaintiff's ability to work, Agency policy holds that no longer meeting a listing level counts as medical improvement related to one's ability to work. *See* 20 C.F.R. § 404.1594(c)(3)(i). Because the ALJ found Plaintiff no longer met a listing level, his medical improvement is related to his ability to work. Therefore, there is substantial evidence that Plaintiff experienced medical improvement as of July 18, 2009.

## F. Lack of Mental Limitations in RFC Finding

Plaintiff argues that the ALJ failed to provide for any mental limitations when determining his RFC. (D.I. 11 at p. 13). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ "must consider all allegations of physical or mental limitations or restrictions . . . ." *Id.*

In his brief, Plaintiff discusses that the ALJ determined Plaintiff's depression to be a severe impairment and that he "had mild limitations in the areas of daily living and social functioning, and moderate limitations with regard to concentration, persistence or pace." (D.I. 11 at p. 13). Plaintiff notes that "[t]hen, inexplicably, the ALJ failed to include any limitations regarding [his] mental impairment in her RFC finding." (*Id.*). This is not an accurate statement. Defendant is correct in arguing that ALJ did provide for mental limitations in her RFC assessment. (D.I. 14 at p. 14). In addition to the physical limitations she placed on Plaintiff's RFC, the ALJ included limitations that reflected his mental limitations. The ALJ determined that

23

Plaintiff could not perform production pace work. (Tr. at p. 26). The ALJ also limited him to "simple unskilled work." (*Id.*). Therefore, Plaintiff is incorrect in stating that the ALJ erred by failing to include any mental limitations in her RFC assessment of him.

## IV. CONCLUSION

For the reasons stated above, the Court grants Plaintiff's motion for summary judgment (D.I. 10), denies Defendant's motion for summary judgment (D.I. 13), and remands the case for further proceedings consistent with this Memorandum Opinion. An appropriate order will be entered.